UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-21975-CIV-MARRA

JOHN DOE, a minor by and through
MOTHER DOE, as parent and natural
guardian, and MOTHER DOE, individually,

    Plaintiffs,

v.

CITY OF OPA-LOCKA, a municipal
corporation, Y. ABELLO a/k/a Y.J.
ALBELO and HASSAN HOSEIN,

    Defendants.
_____/

## OPINION AND ORDER

This cause comes before the Court upon Defendant Albelo's and Defendant Hosein's Motion to Dismiss Plaintiffs' Second Amended Complaint (DE 59); Defendant City of Opa-Locka's Motion to Dismiss and Incorporated Memorandum of Law (DE 64); and Defendant Albelo's and Defendant Hosein's Motion for Rule 11 Sanctions with Incorporated Memorandum of Law (DE 105). Plaintiffs responded. (DE 66; DE 86; DE 108). Defendants replied. (DE 73; DE 89; DE 110). The Court has considered the briefs of the parties and is otherwise advised in the premises.

**I. Background**[1]

On the morning of September 11, 2010, Mother Doe obtained a restraining order against her ex-boyfriend Victor Howard—with whom she lived at the time—to protect herself and her minor children from Howard's abuse. (Complaint ¶¶ 11, 14). The restraining order included the following

---

[1] When considering Defendants' motions to dismiss, the Court must accept all of Plaintiffs' allegations as true in determining whether they have stated a claim for which relief could be granted. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

provisions:

>   a. VICTOR HOWARD shall not go to, in or within 500 feet of: MOTHER DOE's home in Opa-Locka. MOTHER DOE shall have temporary exclusive use and possession of the home.
>
>   b. VICTOR HOWARD, in the presence of a law enforcement officer, may make a single visit to the premises for the purposes of obtaining his personal items. A law enforcement officer with jurisdiction over the home from which these items are to be retrieved shall accompany VICTOR HOWARD to the home and must stand by to ensure that he vacates the premises with only his personal items.
>
>   c. MOTHER DOE shall, on a temporary basis, have 100% time sharing with respect to the children she had with VICTOR HOWARD.

(Complaint ¶ 15) (emphasis omitted). Mother Doe had two children with Howard, B.H. and L.H., and two children unrelated to Howard, T.F. and John Doe. (Complaint ¶ 11). All four children lived in the home with Mother Doe and Howard. *Id.*

Howard has a lengthy criminal history in Florida, a history that includes violence toward Mother Doe. (Complaint ¶ 12). On September 10, 2010, the day before Mother Doe obtained the restraining order, she asked Howard to leave their home because "she had become terrified of him and feared for the safety of herself and her children" due to recent acts of physical aggression and threats of violence. (Complaint ¶ 13).[2] In response to Mother Doe's request that he leave the home, Howard said that "he would kill the whole family before he left." *Id.*

Two City of Opa-Locka police officers, Defendants Albelo and Hosein, served Howard with the restraining order on the afternoon of September 11, 2010. (Complaint ¶ 16). Howard became enraged. (Complaint ¶ 17). One of the officers asked Howard if he had somewhere to go; but when Howard said he did not, rather than forcing him to vacate in accordance with the terms of the

---

[2] This escalating aggression is exemplified by incidents where Howard held Mother Doe against her will, ripped her shirt, and threatened to kill her and her family. *Id.*

2

restraining order, the officers told Mother Doe that Howard would have 24 hours to leave the home with his personal belongings. (Complaint ¶ 18). Mother Doe insisted on Howard leaving immediately, but the officers affirmed that Howard would have 24 hours to leave. *Id.* Mother Doe said that she would immediately leave the home with all of the children rather than risk having Howard physically abuse her or them. *Id.* Howard's response was that "[t]he kids are staying with me." (Complaint ¶ 19).

When one of the officers stopped Mother Doe from taking the children, she relied on the restraining order to try to convince the officer that she was entitled to custody. (Complaint ¶ 20). The terms of the restraining order, however, only provided that "MOTHER DOE shall, on a temporary basis, have 100% time sharing *with respect to the children she had with VICTOR HOWARD*." (Complaint ¶ 15) (emphasis added). The children Mother Doe had with Howard were B.H. and L.H. The officer pointed out to Mother Doe that the restraining order was silent as to who was entitled to custody of T.F. and John Doe—Mother Doe's children who were unrelated to Howard. (Complaint ¶ 20). Mother Doe tried to explain that T.F. and John Doe were not listed in the restraining order because they were not Howard's children, and she told the officers that "I want to take *all* my kids." (Complaint ¶ 21) (emphasis in original). She further explained that John Doe "in particular must come with her because he is mentally disabled . . . ." *Id.*

The officers asked B.H. and T.F. whether they wanted to stay or leave the home, and the two children said they wanted to leave. (Complaint ¶ 23). Mother Doe again told the officers that John Doe was mentally disabled and had to come with her, but when he did not immediately leave the home one of the officers told Mother Doe that "he was losing his patience and that MOTHER DOE

3

would be arrested if she did not immediately leave the home." *Id.*[3] Mother Doe left with T.F., B.H., and L.H. (Complaint ¶ 24). John Doe remained in the home with Howard. *Id.*

According to the allegations of the complaint, Howard then "brutally raped, restrained, and physically beat MOTHER DOE's mentally disabled minor son, JOHN DOE." (Complaint ¶ 24). Howard "restrained JOHN DOE's arms behind his back with electrical cords, ripped off JOHN DOE's clothes, bent him over the toilet, and anally raped the minor with his penis. VICTOR HOWARD's beating left bruises all over JOHN DOE's body. VICTOR HOWARD also cut JOHN DOE's neck and hand with a knife." (Complaint ¶ 26).[4]

Plaintiffs John Doe, a minor by and through Mother Doe as a natural guardian, and Mother Doe individually bring a § 1983 action against the Defendant City of Opa-Locka and Defendant Officers Albelo and Hosein for Howard's alleged sexual abuse of John Doe. The sixteen-count Second Amended Complaint (DE 56) sets forth three counts alleging a violation of the substantive due process right to bodily integrity (Counts I, VIII, IX), six counts alleging a violation of the substantive due process right to familial integrity (Counts II, III, X, XI, XII, XIII), two counts alleging that the Defendant City engaged in a custom, policy, or practice in derogation of constitutional rights (Counts IV, V), two counts alleging that the City engaged in deficient training practices causing constitutional harm (Counts VI, VII), two counts alleging that the Defendant

---

[3] It is unclear from the face of the complaint where exactly John Doe was in the home during this encounter or whether he was even aware the officers were present.

[4] Since the filing of the Second Amended Complaint, John Doe and Mother Doe have said that Victor Howard did not abuse John Doe, as alleged in the Complaint. (Mother Doe testified under oath to that effect). *See infra* Part III. Rather, according to Plaintiffs, it was Howard's daughter Christine who was responsible for the abuse. The Court must take the allegations of the Second Amended Complaint—including the allegations that Howard was the abuser—as true for purposes of Defendants' motions to dismiss. The Court notes John Doe and Mother Doe's subsequent inconsistent statements because they are relevant to the Defendant Officers' motion for Rule 11 sanctions, discussed below.

officers unlawfully seized John Doe in violation of the 4th Amendment (Counts XIV, XV), and one count of common law negligence against the City (Count XVI).

The officers move to dismiss the eight counts against them (Counts VIII, IX, X, XI, XII, XIII, XIV, XV) on the grounds that Plaintiffs have no substantive due process right to protection from Howard, a non-state actor; the officers' conduct is not "conscience shocking" in the constitutional sense; and in any event the officers are entitled to qualified immunity. The City moves to dismiss the eight counts against it (Counts I, II, III, IV, V, VI, VII, XVI) on grounds similar to those of the officers: Plaintiffs have no substantive due process right to protection from a non-state actor; and Plaintiffs have not adequately alleged a custom and policy claim, a failure to train claim, or a common law negligence claim. Plaintiffs respond by suggesting that a substantive due process right was established when the officers took "custody" of John Doe by divesting Mother Doe of his custody, and that Plaintiffs sufficiently allege their claims against the City. For the reasons that follow, the Court finds for Defendants.

## II. Defendants' Motions to Dismiss[5]

### A. Legal Standard

Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claims" that "will give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." Fed. R. Civ. P. 8(a). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual

---

[5] The Court held oral argument on Defendants' motions to dismiss on June 26, 2012. (DE 111).

5

allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679.

### B. Analysis

The Second Amended Complaint alleges that Defendants violated Plaintiffs' substantive due process rights to bodily and familial integrity; that the City engaged in customs, policies, or practices (including deficient training practices) in violation of constitutional rights; that the officers unlawfully seized John Doe; and that the City was negligent.

#### i. Substantive due process

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." As relevant here, "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (plurality) (citing *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 847–49 (1992)).

##### 1. right to bodily integrity (Counts I, VIII, IX)

John Doe brings three counts alleging that his substantive due process right to bodily integrity

6

was violated: one count against the City and one count against each of the two officers. Taking the allegations of the Complaint as true, however, it was not the City or the officers that sexually abused John Doe; it was Victor Howard.

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text. Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was intended to prevent government "from abusing [its] power, or employing it as an instrument of oppression." Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes.

*DeShaney v. Winnebago Cnty. Dept. of Soc. Services*, 489 U.S. 189, 195–96 (1989) (internal citations omitted).

In *DeShaney*, the Supreme Court held that "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. The Court reasoned that "[i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Id.* at 200.

Since *DeShaney*, the Eleventh Circuit has held that "only custodial relationships automatically give rise to a governmental duty, under substantive due process, to protect persons

from harm by third parties." *Doe v. Braddy*, 673 F.3d 1313, 1318 (11th Cir. 2012) (citing *White v. Lemacks*, 183 F.3d 1253, 1257 (11th Cir. 1999)). In a non-custodial setting, "a substantive due process violation would, at the very least, require a showing of deliberate indifference to an extremely great risk of serious injury to someone in Plaintiffs' position . . . . To act with deliberate indifference, a state actor must know of and disregard an excessive—that is, an extremely great—risk to the victim's health or safety." *Waddell v. Hendry Cnty. Sheriff's Office*, 329 F.3d 1300, 1306 (11th Cir. 2003) (internal citations omitted). Thus, the threshold inquiry here is whether a custodial relationship existed between Defendants and John Doe such that a governmental duty automatically arose under substantive due process, or whether John Doe must show that, at the very least, Defendants knew of and disregarded an extremely great risk to his health or safety.

Plaintiffs argue that John Doe is a child who must always be in a custodial relationship as a matter of law. Plaintiffs also assert that Defendants interfered with Mother Doe's custodial relationship with him thereby creating an alternative custodial relationship between Defendants and John Doe. Plaintiffs further suggest that, once Mother Doe's custody of John Doe was divested and placed in Defendants' control, Defendants transferred custody to Victor Howard.[6] The Court rejects

---

[6] At oral argument, Plaintiffs' counsel summarized the argument as follows:

"I mean, for constitutional purposes, there's this, you know, it's been described as the oldest fundamental liberty interest, the right of mother and child to have their—you know, their mother-child relationship. When that was divested, somebody had custody, and the officers had not yet decided what they were going to do until they left the home and left [John Doe] in the hands of this enraged man.

By refusing to allow Mother Doe to move him, essentially they, you know, they forced him to stay put. They restrained him, you know, use the terms of seizure. Remember, this is a mentally disabled boy. It's not as if he could, you know, walk out the door and be safe. But by refusing to allow Mother Doe to take him out of the home, as she had the right to do, they essentially forced him to stay put, depriving him of his mother's opportunity to take him to safety. They were in custody of him until they left him with Victor Howard.

However fleeting that may have been, five minutes, 10 minutes, 15, whatever it was, they had—the officers had custody of him, because they had deprived Mother Doe of her constitutional right to custody and deprived Mother—John Doe

John Doe's "constructive custody" theory of substantive due process protection.[7]

There is simply no evidence or support for the proposition that John Doe was ever placed in Defendants' custody. John Doe was home with Victor Howard when the officers served Howard with the restraining order; he was home with Victor Howard when they left. To conclude that a custodial relationship between Defendants and John Doe was momentarily created when Mother Doe left the home at the officers' demands would be to create a legal fiction at odds with the Supreme Court's reluctance "to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

---

of his constitutional right to be with his mother. They had taken custody of him until such time as they decided to leave the home."

(DE 111 at 24–25).

[7] The two cases John Doe cites in support of his "constructive custody" theory—*White v. Rochford*, 592 F.2d 381 (7th Cir. 1979), and *Taylor v. Ledbetter*, 818 F.2d 791 (11th Cir. 1987)—were decided before *DeShaney* and provide no support for the "constructive custody" argument. *Taylor* involved an actual physical custodial relationship between the plaintiff and the state, 818 F.2d at 792, a relationship not present here. And *White*, which held that police officers may not with constitutional impunity "abandon children and leave them in health-endangering situations after having arrested their custodian and thereby deprived them of adult protection," 592 F.2d at 382, is factually distinguishable. In *White*, a man was stopped and arrested on a busy, limited-access highway with three of his minor relatives as passengers. Although the man pleaded with the officers to take the minor children to a phone to contact their parents, the officers refused. Instead, the officers abandoned the minors in the car on the side of a Chicago highway in October with no adult supervision. The children were forced to "leave the car, cross eight lanes of traffic and wander on the freeway at night in search of a telephone." *Id.* A phone was found and the minors called for help, but the mother of two of the children had no car and no way to pick up the minors. When she called the police for assistance, however, they again refused. The children were ultimately picked up by a neighbor after "a prolonged, but unspecified, length of time." *Id.* Concluding that the officers' conduct, as alleged, violated the plaintiffs' substantive due process rights to bodily integrity, the Seventh Circuit reasoned that "[i]n the case before us the police could not avoid knowing that, absent their assistance, the three children would be subjected to exposure to cold weather and danger from traffic. This indifference in the face of known dangers certainly must constitute gross negligence." *Id.* at 385. This Court reads *White* as support for John Doe's claim that Defendants "knew of and disregarded an extremely great risk to John Doe's health or safety," not as support for a theory of "constructive custody." And to the extent that John Doe relies on *White* for Defendants' knowledge and disregard of risk rising to the level of a substantive due process violation, the Court finds that, as explained more fully below, the situation here was not one in which "the police could not avoid knowing that, absent their assistance," John Doe would be subject to harm.

9

This Court declines the invitation to break new ground by engineering a custodial relationship where none exists. Consequently, establishing a substantive due process violation here requires a showing that Defendants knew of and disregarded an extremely great risk to John Doe's health or safety. Taking the allegations of the complaint as true, however, there was no reason for Defendants to suspect that Howard might be violent toward John Doe because John Doe does not allege that the Defendant Officers were aware of Howard's criminal history or his recently escalated aggression toward Mother Doe. In fact, the complaint alleges that the officers were hesitant to let Mother Doe take John Doe *because John Doe was not listed in the restraining order*. Despite Mother Doe's explanation to the officers that John Doe was not listed because he was unrelated to Howard, the officers were in a situation in which two adults who lived in the same home both sought to keep a child from staying with the other. Based on these facts, it is not at all clear how the officers could have known with any degree of certainly that John Doe was unrelated to Howard or that staying with Howard posed any kind of threat to John Doe's safety. Thus, from the facts alleged, the Court cannot conclude that Defendants knew about and disregarded an extremely great risk that Howard would harm John Doe once Mother Doe was removed from the home.[8] Because Defendants had no constitutional duty to protect John Doe against Victor Howard's violence, "its failure to do

---

[8] In Plaintiffs' opposition to the Defendant officers' motion to dismiss (DE 66), they state that if the Court finds the allegations of the Second Amended Complaint insufficient to state a plausible constitutional violation then they request that the Court either a) grant Plaintiffs leave to amend or b) consider the findings of the City of Opa-Locka Police Department Professional Compliance Bureau (internal affairs) pertaining to the September 11, 2010 encounter (DE 66, Attach. 1). According to Plaintiffs, these findings conclude generally that the Defendant officers committed multiple serious violations of police procedure and rules of conduct, and specifically that one of the Defendant officers ran a criminal background check on Victor Howard before executing the restraining order. (DE 66 at 20–21). If one of the officers ran a background check on Howard, the argument goes, the officers should have known that Howard had a history and propensity for criminal violence when they served him. The Court declines to consider the findings because they are outside the pleadings, but the Court notes that even if the findings were considered, the officers' knowledge of Howard's criminal history would not overcome the deficiencies in Plaintiffs' allegations because nothing in that criminal history would put the officers on notice that Howard might be violent towards John Doe. As alleged in the Second Amended Complaint, Howard had a criminal history that involved violence toward Mother Doe—not her children.

so—though calamitous in hindsight—simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 202.

### 2. right to familial integrity (Counts II, III, X, XI, XII, XIII)

John Doe and Mother Doe bring six counts alleging that their substantive due process rights to familial integrity were violated: one count each against the City and one count each against each of the two officers. "In § 1983 cases grounded on alleged parental liberty interests, we are venturing into the murky area of unenumerated constitutional rights. When this happens, our first task is to determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Robertson v. Hecksel*, 420 F.3d 1254, 1256 (11th Cir. 2005) (internal citation and quotations omitted).

> Although the text of the Constitution contains no reference to familial or parental rights, Supreme Court precedent has long recognized that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children. A corollary to this right is the private realm of family life which the state cannot enter that has been afforded both substantive and procedural protection.

*Lofton v. Sec'y of Dept. of Children & Family Services*, 358 F.3d 804, 812 (11th Cir. 2004) (internal citations and quotations omitted). Notwithstanding the existence of a right to familial integrity, however, the Court recognizes that "the Fourteenth Amendment must not be used through section 1983 as a 'font of tort law' to convert state tort claims into federal causes of action." *Waddell*, 329 F.3d at 1305.

Plaintiffs contend that Defendants purposely interfered with their rights to family integrity by divesting Mother Doe of her custodial authority over John Doe and then delegating this authority to Victor Howard. Plaintiffs further argue that was no legitimate reason for Defendants to have

separated John Doe from Mother Doe and left him in the home with Howard—especially because Howard and John Doe were unrelated. The parties generally disagree over what is required of Plaintiffs to plead these counts, e.g., whether Plaintiffs must allege 1) a permanent, physical loss of association as opposed to a temporary loss; or 2) conduct that was directly aimed at interfering with the parent-child relationship as opposed to merely affecting the relationship incidentally. The parties' disagreement presents an issue of first impression in the Eleventh Circuit.[9]

Based on these facts, however, the Court concludes, as a matter of law, that Defendants' interference with the parent-child relationship does not rise to the level of a violation of due process. Defendants' interference was temporary and incidental to Defendants' main objectives during the encounter: to serve the restraining order and have Howard exit the home. Moreover, Defendants were not aware of any threat of harm to John Doe were he to stay. But most importantly, even assuming Defendants made a poor decision in separating Mother Doe from her son, that decision did not affect Mother Doe's *legal* custody of John Doe; it merely deprived her of physical custody for a limited period of time. Consistent with Supreme Court directives, the Court once again declines the invitation to extend the protections of the due process clause to such a minimal intrusion of the parent-child relationship.

### ii. Unconstitutional custom, policy, or practice (Counts IV, V)

The City cannot be liable for adopting a custom, policy, or practice that did not cause a due process violation. *See City of Los Angeles v. Heller*, 475 U.S. 796, 798–99 (1986); *see also*

---

[9] Other circuits are divided on the issue. The First and Second Circuit, for example, "emphasize the necessity of a permanent, physical loss of association," *Walker v. Fresno Police Dep't*, No. 1:09-CV-1037 OWW GSA, 2010 WL 582084, at *5 n.2 (E.D. Cal. Feb. 11, 2010) (citing *Pittsley v. Warish*, 927 F.2d 3, 8 (1st Cir. 1991), *abrogated by Martinez v. Cui*, 608 F.3d 54, 63–65 (1st Cir. 2010); and *Tenenbaum v. Williams*, 193 F.3d 581, 600–01 (2d Cir. 1999)), while the Eastern District of California has suggested that "an allegation of temporary deprivation is not automatically barred," *See Walker*, 2010 WL 582084, at *5 n.2.

*Garczynski v. Bradshaw*, 573 F.3d 1158, 1170 (11th Cir. 2009) ("Analysis of a state entity's custom or policy is unnecessary . . . when no constitutional violation has occurred."). Here, Plaintiffs suffered no due process violations at the City's hands. Thus, Counts IV and V, which allege the presence of unconstitutional customs, policies, or practices, are dismissed.

### iii. Deficient training practices (Counts VI, VII)

Similarly, to establish the liability of a government body under § 1983, the allegedly unconstitutional policy must be the "moving force" of a constitutional violation. *See Board of Cnty. Commissioners v. Brown*, 520 U.S. 397, 404 (1997); *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). As explained above, any of the City's allegedly deficient training practices were not the "moving force" of any constitutional violation because no constitutional violations occurred. Thus, Counts VI and VII are dismissed.

### iv. Seizure in violation of the 4th Amendment (Counts XIV, XV)

John Doe brings two counts (one count against each officer) alleging that the officers unlawfully seized him when they "removed him" from his mother's custody.

> A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied. Thus, an unintended person may be the object of the detention, so long as the detention is "willful" and not merely the consequence of "an unknowing act." A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned.

*Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal citations and quotations omitted). As the Supreme Court expressed in *Brendlin*, an attempted seizure is not a seizure. *Id.* at 626 n.2 ("[N[either usage nor common-law tradition makes an *attempted* seizure a seizure. The common law may have

made an attempted seizure unlawful in certain circumstances; but it made many things unlawful, very few of which were elevated to constitutional proscriptions.")

Plaintiffs fail to allege that John Doe was aware of the officers' presence at the home, that he was physically seized by them, or that the officers restricted or prevented him from moving freely as he wished. Nor is there any suggestion that such allegations could be made in good faith. The only plausible reading of the complaint is that the officers arrived at the home, served Howard with the restraining order, and threatened Mother Doe with arrest unless she left all while John Doe—a mentally disabled minor—remained in the home unaware of the encounter. That he was "taken into custody" is a legal conclusion that is not supported by any facts in the complaint, and John Doe provides no support for the proposition that an individual can be "seized" in violation of the Fourth Amendment under these facts. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful.").

### v. Common Law Negligence (Count XVI)

With the dismissal of Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining state law claim of common law negligence (Count XVI).

### III. Defendant Officers' Motion for Rule 11 Sanctions

The Defendant officers move for an order imposing Rule 11 sanctions against Plaintiffs and their counsel for filing and thereafter not withdrawing Plaintiff's Second Amended Complaint (DE 56). Federal Rule of Civil Procedure 11(b) provides:

> **Representations to the Court.** By presenting to the court a pleading, written motion,

or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

"The purpose of Rule 11 is to deter baseless filings in district court and thus streamline the administration and procedure of federal courts. . . . In assessing the propriety of Rule 11 sanctions, this Court asks: (1) whether the party's claims are objectively frivolous, and (2) whether the person who signed the pleadings should have been aware that they were frivolous." *Peer v. Lewis*, 606 F.3d 1306, 1311 (11th Cir. 2010) (citations and quotations omitted). As the Eleventh Circuit has noted,

> [t]he advisory committee notes on the amendments to Rule 11 aid the Court in interpreting and applying this rule. For example, the advisory committee note of 1993 states that Rule 11 was amended to emphasize "the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable." The commentary specifically notes that "if evidentiary support is not obtained after a reasonable opportunity for further investigation or discovery, the party has a duty under the rule not to persist with that contention." Finally, "[t]he court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted."

*Peer*, 606 F.3d at 1311 (internal citations omitted).

Here, the officers suggest that Victor Howard never harmed John Doe on September 11,

2010. The officers further suggest that Plaintiffs most likely knew this at the time the initial complaint was filed on May 31, 2011 (DE 1), but certainly no later than April 12, 2012, when John Doe testified in a State Attorney interview that Howard never harmed him on the day of the alleged abuse (DE 110, Attach. 1).[10] Moreover, based on exhibits introduced by the officers, since the filing of the Second Amended Complaint Mother Doe herself testified that Victor Howard did not abuse John Doe (DE 110, Attach. 4); and Mother Doe told the assistant public defender who represented Victor Howard in the criminal proceeding borne from Howard's alleged abuse that Howard "did not molest [John Doe] and had not committed the crimes charged by the State" (DE 110, Attach. 3).[11]

Plaintiffs respond by arguing that the Rule 11 issue raised by Defendants is premature at this stage of the litigation and by pointing to a number of disclosures made by John Doe in close temporal proximity to the day of the alleged abuse that arguably provide a good-faith basis for Plaintiffs' theory of the case: 1) John Doe's disclosure to Mother Doe on or about September 13, 2010, that Howard physically and sexually assaulted him (DE 108, Attach. 1); 2) John Doe's similar disclosure to a nonparty on the same day (DE 108, Attach. 2); and 3) John Doe's similar disclosure to a forensic interviewer on the same day (DE 108, Attach. 3). Plaintiffs further point to a mental health care professional's impression that Howard abused John Doe. (DE 108, Attach. 4).

In view of John Doe's initial statements supporting the allegations of wrongdoing and his

---

[10] John Doe testified that it was Howard's eighteen-year-old daughter who forced him to engage in vaginal intercourse after Mother Doe left the home. The Court notes that the officers claim Howard's daughter has testified twice under oath that she was in the home on September 11, 2010 and that nothing happened to John Doe (DE 110 at 6), but the exhibit to which the officers cite contains no transcript of any such testimony and was apparently cited in error. (DE 110, Attach. 6).

[11] Plaintiffs moved to strike all of the officers' exhibits because the officers included them in the reply to Plaintiff's response to the motion for sanctions. (DE 112). According to Plaintiffs, introducing the exhibits in the reply did not give Plaintiffs an appropriate opportunity to respond. The Court ordered Plaintiffs to file a surreply and denied the officers' motion to strike as moot. (DE 124).

mental disability, it was not unreasonable for Plaintiff's counsel and Mother Doe to rely upon them to pursue this litigation, despite the subsequent inconsistent statements.

### IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant Albelo's and Defendant Hosein's Motion to Dismiss Plaintiffs' Second Amended Complaint (DE 59) is **GRANTED.** Defendant City of Opa-Locka's Motion to Dismiss and Incorporated Memorandum of Law (DE 64) is also **GRANTED.** Plaintiff's federal claims (Counts I through XV) are **DISMISSED WITH PREJUDICE** because the Court concludes that giving Plaintiff leave to amend the federal claims would be futile. Plaintiff's state law negligence claim (Count XVI) is **DISMISSED WITHOUT PREJUDICE.**[12] Defendant Albelo's and Defendant Hosein's Motion for Rule 11 Sanctions with Incorporated Memorandum of Law (DE 105) is **DENIED,** but the Court denies Plaintiffs request for an award of attorney fees under Rule 11(c)(2).

The Clerk shall **CLOSE** this case. All pending motions are **DENIED** as moot.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 19th day of March, 2013.

KENNETH A. MARRA
United States District Judge

---

[12] Because the Court concludes that the Due Process Clause did not require Defendants to protect John Doe from Victor Howard, the Court has no occasion to consider whether the individual Defendant officers are entitled to a qualified immunity defense. *See DeShaney*, 489 U.S. at 202 n.10.

17